IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LESLEY N. GARCIA**,

      Plaintiff,

vs.                                                   No. 06-CIV-425 MCA/LFG

**JOHN E. POTTER, POSTMASTER
GENERAL, UNITED STATES
POSTAL SERVICE,**

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on *Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment* [Doc. 34], filed March 6, 2007, and Defendant's *Motion for Summary Judgment and Memorandum in Support* [Doc. 36], filed March 9, 2007. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants *Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment* and denies as moot the *Motion for Summary Judgment and Memorandum in Support*.

**I. BACKGROUND**

On May 18, 2006, Plaintiff Lesley Garcia filed her *Complaint for Employment Discrimination on the Basis of Sex and Retaliation* pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff, a former employee of the

United States Postal Service (USPS), alleges that she was subjected to a hostile work environment and then retaliated against when she reported the situation. [See generally Doc. 1].

### A. The Alleged Conduct

Plaintiff began her employment with the USPS on April 5, 2004 as a casual clerk in the Albuquerque, New Mexico district office. [Doc. 1 at 2]. She alleges that she began to experience unwanted touching by, and comments from, co-worker Fernando Sanchez shortly after she started. This alleged conduct consisted of the following:

**Incident No. 1:** In June of 2004, Plaintiff was working in the mail room when Sanchez walked up behind her and began rubbing and scratching the middle and lower parts of her back. Plaintiff told Sanchez "Don't do that[,]" but "[h]e just kind of laughed it off and walked out[.]" [Doc. 38; Exh. A, Dec. 8, 2006 depo. of Lesley N. Garcia at 45-50]. Plaintiff told only her mother about this incident.

**Incident No. 2:** Later in June of 2004, Plaintiff again was in the mail room when Sanchez approached her from behind and pushed his body up against hers. Plaintiff asked Sanchez, "What are you doing? You are weird. Don't[.]" [Doc. 38; Exh. A, Garcia depo. at 51]. According to Plaintiff, Sanchez smirked and calmly left the room. As with the first incident, Plaintiff told only her mother about what had happened. [Id. at 54-55].

**Incident No. 3:** In July of 2004, Plaintiff was sitting in the employee lounge when Sanchez entered and asked Plaintiff what she planned to do for money, since a co-worker who had been out on medical leave was returning. Plaintiff states that Sanchez asked why she did not just go to work at Hooters.[1] [Doc. 35; Exh. B, "Summary of Interview" at 19-20; Doc. 38; Exh. A, Garcia depo. at 56]. Plaintiff responded, "No way," and Sanchez left the room, laughing. [Doc. 38; Exh. A, Garcia depo. at 56-57].

**Incident No. 4:** In August of 2004, Plaintiff was at the paper shredder, shredding documents, when "all of a sudden [she] felt a hand on [her] left thigh above [her] knee, rub all the way up to [her] left breast." [Doc. 35; Exh. B, "Summary of Interview" at 20-21; Doc. 38; Exh. A, Garcia depo. at 57]. When Plaintiff realized that it was Sanchez touching her, she told him "Don't, what are you doing? God, you're weird." [Doc. 35; Exh. B, "Summary of Interview" at 21]. Plaintiff told only her mother about this incident, after which Sanchez never touched her again. [Doc. 38; Exh. A, Garcia depo. at 58, 150].

**Incident No. 5:** Plaintiff was speaking to Sanchez and another co-worker when Sanchez commented that "if [Plaintiff] had short nails, then [Plaintiff]

---

[1] Hooters is a chain of restaurants at which, according to its web site, "[t]he element of female sex appeal is prevalent." http://www.hooters.com/company/about_hooters/.

wasn't a woman." [Doc. 38; Exh. A, Garcia depo. at 61]. Plaintiff then brought up the topic of her daughter's birthday party, and Sanchez suggested she hold it at Hooters. [Id. at 61-62]. Later that day, Plaintiff was in the employee lounge when Sanchez approached her and, while counting money, told Plaintiff, "Just wait right there. I want to give you something." [Id. at 62-63]. Plaintiff interpreted this as a possible attempt by Sanchez to bribe her not to report his earlier remarks and/or a comment on what Sanchez perceived to be Plaintiff's financial situation. [See Doc. 35; Exh. B, "Summary of Interview" at 24].

It is undisputed that Plaintiff contacted her supervisor, Gloria Diedrich, on September 13, 2004 and reported the alleged sexual harassment. [Doc. 35 at 2; Doc. 38 at 2].

### B. The Investigation and Its Aftermath

Randall McAfee is the USPS's Maintenance Operations Manager. He also serves on an assignment basis as a sexual-harassment factfinder under the USPS's Sexual Harassment Policy. [Doc. 35; Exh. B, Affidavit of Randall McAfee]. On September 24, 2004, McAfee, along with Eileen LaRiva, conducted interviews of Plaintiff and other witnesses as part of their factfinding investigation into Plaintiff's allegations against Sanchez. [Id.]. McAfee has represented that he both discussed Postal Bulletin 22069 (2-7-02) with Plaintiff and gave her a copy to keep. [Id.]. Postal Bulletin 22069 (2-7-02) is titled "Postal Service Policy on Sexual Harassment" and provides, in pertinent part, that

4

> Postal Service employees who believe they are the victims of sexual harassment or inappropriate sexually based conduct or who have witnessed inappropriate conduct of a sexual nature should bring the situation to the attention of a manager, supervisor, union official, an Equal Employment Opportunity (EEO) counselor, or to the manager of Human Resources.
> . . . .
> **In addition**, employees can seek relief through the EEO complaint process, grievance arbitration procedures established through the collective bargaining agreements with the unions, and the nonbargaining grievance procedures described in section 650 of the *Employee and Labor Relations Manual*. Employees pursuing an EEO complaint must contact an EEO counselor within 45 days of the act(s) giving rise to the claim in order to preserve their rights under federal law.

[Id.; attached "Postal Bulletin 22069 (2-7-02) (emphasis added)]. McAfee included a summary of his interview with Plaintiff in his written report. [Doc. 35; Exh. B, Affidavit of Randall McAfee].

On October 27, 2004, Plaintiff met with Human Resources Director Jim Mercurio. [Doc. 1 at 4; Doc. 35 at 2]. According to Plaintiff, Mercurio told her that he had looked into the matter and determined that no sexual harassment had occurred. [Doc. 1 at 4]. Although Plaintiff testified through her deposition that Mercurio told her that Sanchez "was going to take a class," Sanchez testified through his deposition that he was not disciplined at all. [Doc. 38; Exh. A, Garcia depo. at 93; Exh. C, Jan. 31, 2007 depo. of Fernando N. Sanchez at 35]. Plaintiff, however, had her work station moved twice in an attempt to put distance between her and Sanchez. [Id.; Exh. B, Jan. 31, 2007 depo. of Aurora Guzman McDaniel at 22, 26]. After the sexual-harassment factfinding investigation concluded, Sanchez never

5

made another remark to Plaintiff that she found offensive. He did, however, continue to remain near Plaintiff, "always smirking and . . . basically rubbing it in, which really upset [her]." [Doc. 38; Exh. A, Garcia depo. at 150-151].

It was also after the investigation that Plaintiff began to notice EEO posters on cubicle walls "all over the place." [Doc. 38; Exh. A, Garcia depo. at 98-99]. Plaintiff did not read these posters thoroughly, however, because she believed that the USPS's sexual-harassment factfinding investigation was an EEO investigation, even though nobody had actually told her that. At Plaintiff's deposition, the following exchange took place:

> Q: When you saw these posters that were put up afterwards, did you read any of them?
> A: I just kind of looked really quick, but I didn't totally read them, because my—I had already reported mine, and I thought they did the investigation when they told me they were. So I thought I did everything right to report it, and, you know, they told me—I was going by what managers and—
> Q: Well, did anybody ever tell you they filed an EEO complaint on your behalf?
> A: No, they just told me that they did an investigation. I didn't hear anything about EEO. I didn't know what that was.
> Q: And so when you saw these posters, you didn't bother to read them?
> A: I just kind of saw the part that sticks out, where it says they will not tolerate it, but I didn't—I thought their investigation was the—I guess the EEO investigation or whatever. I don't know. It's all new to me. I've never done this. I don't know exactly the steps, and I was going by what managers and people higher up were telling me to do, so I thought I was doing everything right, you know.
> Q: But nobody ever told you that was an EEO investigation,

6

>    did they?
> A: They just said it was their investigation.
> Q: But they didn't say it was for purposes of Equal Employment Opportunity, did they?
> A: No.

[Id. at 100-101]. Lori L. Foster, Diversity Development Specialist for the USPS, has confirmed that three posters (1) explaining that equal opportunity is the law; (2) setting forth the USPS's policy on sexual harassment; and (3) urging perceived victims of harassment to know their rights and take responsibility, were displayed in Plaintiff's workplace during her period of employment. [Id.; Exh. D, Declaration of Lori L. Foster].

In June of 2005, Plaintiff's position as a casual employee was eliminated, as was that of the one other casual worker in the district office. [Doc. 38; Exh. A, Garcia depo. at 132; see also id.; Exh. B, McDaniel depo. at 36 ("There was a telecon[ference] from our southwest area office, and were told that we had to release all the casuals immediately.")]. Plaintiff reapplied for casual work with the USPS on September 6, 2005 but was not rehired. [Id.; Exh. A, Garcia depo. at 132]. It is undisputed that Plaintiff contacted an EEO officer for the first time on December 28, 2005. [Doc. 35 at 3 and Exh. C; Doc. 38 at 4]. A notation on the officer's *Inquiry Report* states that "[t]he counselee's contact with the EEO Office appears to be beyond the required 45 day time limit." [Id.; Exh. C at 2]. On May 18, 2006, Plaintiff filed her complaint alleging violations of Title VII. [See generally Doc. 1].

## II. ANALYSIS

Title VII makes it unlawful for an employer to, among other things, "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . ."  42 U.S.C. § 2000e-2(a)(1). The exhaustion of administrative remedies is a jurisdictional prerequisite to suit under Title VII. Jones v. Runyon, 91 F.3d 1398, 1439 (10th Cir. 1996). However, "the *timeliness* requirement for administration charges is, like a statute of limitations, subject to such equitable exceptions as waiver, estoppel, and tolling." Hawkins v. Defense Logistics Agency of the Dep't of Defense, 99 F.3d 1149, at *1 n.1 (10th Cir. 1996) (unpublished opinion) (emphasis in original) (*citing* Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)). Thus, while an aggrieved party who chooses to pursue an individual EEO complaint "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action[,]"  29 C.F.R. § 1614.105(a)(1), the 45-day time limit is extendable in certain circumstances. See 29 C.F.R. § 1614.105(a)(2).[2]

---

[2] 29 C.F.R. § 1614.105(a)(2) provides as follows:

> The agency or the Commission shall extend the 45-day time limit in paragraph (a)(1) of this section when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the

In the Tenth Circuit, "a Title VII time limit will be tolled *only* if there has been 'active deception.'"  Johnson v. United States Postal Serv., 861 F.2d 1475, 1481 (10th Cir. 1988) (emphasis in original).  In other words, the Court's powers of equity may not be invoked unless the plaintiff has been (1) lulled into inaction by her past employer, a state or federal agency, or the courts; (2) actively misled; or (3) in some extraordinary way prevented from asserting her rights.  Id. at 1480-81.  Federal courts typically extend equitable relief only sparingly.  Indeed, as the United States Supreme Court explained in Irwin v. Dep't of Veterans Affairs,

> [w]e have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.  We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990) (footnotes omitted); see also Graham-Humphreys v. Memphis Brooks Museum of Art, Inc., 209 F.3d 552, 560-561 (6th Cir. 2000) ("Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's

---

> counselor within the time limits, or for other reasons considered
> sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2).

9

control."); Chico-Velez v. Roche Products, Inc., 139 F.3d 56, 59 (1st Cir. 1998) ("In a nutshell, equitable tolling is reserved for exceptional cases . . . ."). Moreover, the party claiming the benefit of equitable tolling bears the burden of demonstrating the doctrine's applicability. Olson v. Fed. Mine Safety and Health Review Comm'n, 381 F.3d 1007, 1014 (10th Cir. 2004).

By way of example, the Tenth Circuit has approved equitable tolling in Title VII cases where (1) the district court explicitly informed the plaintiff that her action would be considered commenced as of the time she filed a motion to proceed *in forma pauperis*, and appointed counsel later relied on the court's express representation, Carlile v. South Routt Sch. Dist. RE 3-J, 652 F.2d 981, 986 (10th Cir. 1981); (2) a *pro se* plaintiff relied on an unambiguous representation of the district court clerk of court that the filing of plaintiff's right-to-sue letter would toll the applicable limitations period until the he had had sufficient opportunity to obtain counsel, Gonzalez-Aller Balseyro v. GTE Lenkurt, Inc., 702 F.2d 857, 859 (10th Cir. 1983); and (3) the plaintiff, who initially requested reconsideration of an agency decision, was "lulled into inaction by the EEOC['s]" representation in its *Notice of Right to File a Civil Action* that he could bring suit and request reconsideration, without making clear that the right to sue and the right to request reconsideration were distinct, independent rights, and that an election to pursue only the latter completely waived the former. Martinez v. Orr, 738 F.2d 1107, 1109-12 (10th Cir. 1984).

By contrast, the doctrine of equitable tolling has been deemed not to apply where

(1) human resources personnel encouraged the plaintiff to exhaust all administrative processes and internal grievance mechanisms before filing a Title VII complaint, since the information the plaintiff received from H.R. might "have given him false hope that his problems could be resolved internally, but [did] not rise to the level of active deception about the procedures for filing a Title VII claim that [the Tenth Circuit] articulated in [earlier cases,]" Mascheroni v. Bd. of Regents of Univ. of California, 28 F.3d 1554, 1562-63 (10th Cir. 1994), abrogated by Boyler v. Cordant Techs., Inc., 316 F.3d 1137 (10th Cir. 2003); (2) the plaintiff relied on the employer's internal administrative procedures for relief, see Purrington v. Univ. of Utah, 1993 WL 259457, at *8 (D. Utah Jun. 21, 1991) (*citing* Sanders v. Duke Univ., 538 F.Supp. 1143, 1145 (N.D.N.C.1982) *and* Graves v. Univ. of Michigan, 553 F.Supp. 532, 534 (E.D.Mich.1982)); and (3) the plaintiff's untimely filing was due to his alleged limited education and lack of understanding of the law and "the intricacies of the procedural framework of Title VII actions . . . ." Montoya v. Chao, 296 F.3d 952, 958 (10th Cir. 2002).

In this case, the Court concludes that Plaintiff has not demonstrated her entitlement to equitable tolling because she has not shown that her admitted failure to contact an EEO counselor in a timely manner was due to active deception on the part of the USPS. See Johnson, 861 F.2d at 1481. There can be no real doubt that Plaintiff confused the USPS's internal investigation with the EEO process. Indeed, Plaintiff explained more than once during her deposition that she believed the sexual-harassment factfinding investigation *was* an EEO investigation. [See Doc. 38; Exh. A, Garcia depo. at 101 ("I thought their

11

investigation was the—I guess the EEO investigation or whatever."); at 147 ("I just thought their investigation was the—you know, was it [an EEO investigation].")]. But she also stated that nobody at the USPS ever told her that (1) the internal investigation was done for EEO purposes; (2) she could not file an EEO complaint; or (3) the USPS had filed such a complaint on her behalf. [Id. at 65, 101].

Plaintiff similarly does not dispute that she failed to read thoroughly the EEO posters that she observed throughout the workplace and that set forth the time limitations for filing an EEO complaint. She did not read these posters in their entirety because she believed that the completed sexual-harassment factfinding investigation constituted an EEO investigation. [Doc. 38; Exh. A, Garcia depo. at 100-101]. She confused the internal investigation and the EEO investigation because, in her words, "*It's all new to me. I've never done this. I don't know exactly the steps, and I was going by what managers and people higher up were telling me to do, so I thought I was doing everything right . . . .*" [Id. at 101]. But, as already explained, Plaintiff has admitted that nobody told her the internal investigation was done for EEO purposes.[3] As for being new to the process, the Tenth Circuit has rejected the claim

---

[3] Plaintiff's recounting of her meeting with Jim Mercurio is not to the contrary. As Plaintiff explained,

> Jim Mercurio, when I had the meeting with him, when he told me, you know—I had talked to him after they had done the interview with me or whatever at the plant, the investigation, he talked to me to tell me what they were going to do next, and he had just told me that, you know, he denied everything and that, you know, nothing will happen—shouldn't be happening at all, like, you know, and that—and I just got really upset, and I was on the verge of tears, because, you know, it just seemed like he didn't care that that

that equitable tolling is warranted where the complaining party has limited education and little understanding of the law or the "intricacies of the procedural framework of Title VII actions . . . ." Chao, 296 F.3d at 958.

Finally, Plaintiff has not challenged Randall McAfee's assertion that, during his factfinding investigation, he discussed with Plaintiff Postal Bulletin 22069 (2-7-02) (the USPS's policy on sexual harassment) and gave her a copy of the policy to keep. Postal Bulletin 22069 (2-7-02) explains, in pertinent part, the process for reporting alleged sexual harassment internally, further providing that "**[i]n addition**, employees can seek relief through the EEO complaint process. . . ." [Doc. 35; Exh. B, Affidavit of Randall McAfee; attached "Postal Bulletin 22069 (2-7-02) (emphasis added)]. That the EEO complaint process is presented as an additional option would indicate to a reasonable employee—or at least put her on notice—that the EEO process and the internal-reporting process are separate avenues. In the words of the Irwin Court, "the principles of equitable tolling . . . do not extend to what is at best a garden variety claim of excusable neglect." Irwin, 498 U.S. at 96; see also Purrington, 1993 WL 259457, at *7-8 (doctrine of equitable tolling not applicable where there was no active deception on the part of plaintiff's employer and, instead, plaintiff's untimely administrative filing was "[a]t best . . . a case of excusable neglect.").

---

happened.

[Doc. 38; Exh. A, Garcia depo. at 93]. On the basis of this description of Mercurio's reaction to Plaintiff's situation, the Court is unable to conclude that Mercurio somehow lulled Plaintiff into inaction or actively deceived her as to her right to pursue an EEO complaint.

## III. CONCLUSION

On the basis of the foregoing, this Court concludes that the facts of this case do not rise to the level of "particularly egregious circumstances" that have been found to warrant the application of the doctrine of equitable tolling. See Brucks v. O'Neill, 184 F.Supp.2d 1103, 1110-12 (D. Kan. 2001) (collecting Tenth Circuit cases both allowing for and rejecting the application of the equitable-tolling doctrine). For this reason, *Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment* will be granted.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment* [Doc. 34], is **GRANTED**;

**IT IS FURTHER ORDERED** that Defendant's *Motion for Summary Judgment and Memorandum in Support* [Doc. 36] is **DENIED AS MOOT**.

**SO ORDERED** this 31st day of May, 2007, in Albuquerque, New Mexico.

                                                                                    **M. CHRISTINA ARMIJO**
                                                                                    United States District Judge